# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DANIEL S. NELSON,
*Plaintiff*,

v.

NANCY A. BERRYHILL,
*Acting Comm'r, Social Security*
*Administration,*
*Defendant.*

No. 3:18-cv-377 (VAB)

## RULING AND ORDER ON PENDING MOTIONS

Daniel S. Nelson ("Plaintiff") filed this administrative appeal under 42 U.S.C. § 405(g) and 1631(c)(3) against Nancy A. Berryhill, Acting Social Security Commissioner ("Defendant" or "Acting Commissioner"), seeking review of the Social Security Administration's ("SSA") decision denying his claim for Social Security Disability ("SSDI") and Supplemental Security Income Benefits ("SSI"). Complaint ("Compl."), ECF No. 1; *see also* Pl. Mem. of Law in Supp. of Mot. for Order Reversing the Decision of the Comm'r ("Pl. Mem."), ECF No. 20-1.

The Acting Commissioner moves the Court to affirm her decision, Mot. to Affirm the Decision of the Comm'r ("Def. Mot. to Affirm"), ECF No. 22.

For the reasons set forth below, the Court now **DENIES** Mr. Nelson's motion to reverse the decision of the Acting Commissioner, Pl. Mot. for Order Reversing the Decision of the Comm'r ("Pl. Mot. to Reverse"), ECF No. 20; and **GRANTS** the Acting Commissioner's motion to affirm her decision. Def. Mot. to Affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

Born in 1965, Daniel Scott Nelson worked as a carpenter from 1983 to 2013. Transcript of the Administrative Record ("Tr."), ECF No. 17, at 61, 71. Laid off in May 2013, Tr. 65, he then worked briefly as a retail store cashier in 2014, Tr. 54, 386–87, 455. Mr. Nelson initially filed for SSDI and SSI in the fall of 2014, claiming an onset of disability in May 2013. Pl. Mem at 1.

Also, in the fall of 2014, Mr. Nelson reported left shoulder pain to his treating physician. Tr. 579. From then until early 2016, health care providers treated the shoulder with steroid injections, lidocaine treatments, and physical therapy. Tr. 564, 574. The treatments provided only temporary relief. *See* Susan K. Schroeder, PA-C, Note (July 29, 2015), Tr. 454, 574–75 ("He has gone to physical therapy. He has had a steroid injection that has provided him with transient relief, and I did discuss at length with him a surgical procedure.").

By early 2016, Mr. Nelson's SSDI/SSI application had been denied, reconsidered, and denied again. Pl. Mem. at 1, Tr. 102–112. On February 22, 2016, Mr. Nelson filed a request for a hearing before an administrative law judge ("ALJ"). Pl. Mem. at 1, Tr. 112.

Seven days later, Mr. Nelson had shoulder surgery at Lawrence Memorial Hospital. Tr. 562 ("Procedures performed: Arthroscopy, left shoulder debridement, flap lesion, open acromioplasty, distal clavicle excision, open double row rotator cuff repair.").

Following surgery, Mr. Nelson completed approximately four months of physical therapy. Joseph E. Noonan, Jr., M.D., Note (July 18, 2016), Tr. 561. Those treatments proved effective. *Id*. ("On examination today, his wound is in good repair . . . . There is symmetrical external rotation passively in neutral and he internally rotates quite well at the back. The patient

2

was tested in resisted external rotation with minimal pain associated, certainly less than his previous visit and there is no tenderness associated with resisted internal rotation.").

On December 7, 2016, an ALJ heard Mr. Nelson's Social Security case. Pl. Mem. at 1, Tr. 35. At that hearing, Mr. Nelson testified about his shoulder injury, schizophrenia,[1] anxiety, and heart condition. Transcript of Oral Hearing (Dec. 7, 2016), Tr. 37, 45; *see also* Tr. 61, 67, 76, 90.

Mr. Nelson testified about having shoulder problems since the summer or fall of 2014, pursuing treatment with his primary care physical and physical therapists for a year, and seeing a specialist in the summer of 2015. Tr. 51. He explained that the surgery had enabled him to reach above his head (e.g., to get medicine off the top of the refrigerator), but not to lift heavy items from that height. Tr. 40. Mr. Nelson testified that he could carry twenty-five to thirty pounds. Tr. 39.

Mr. Nelson also testified that he gets anxious when leaving the house and only leaves the house once or twice a week, but can force himself to do the things he needs to do (e.g., going to the grocery store), Tr. 44–46. Mr. Nelson reported problems interacting with co-workers and supervisors that allegedly have worsened with age. Tr. 47. He testified to being able to care for himself (e.g., making meals for himself). Tr. 50.

The ALJ also heard from a vocational expert who holds a Master's degree in Rehabilitation Counseling. Resume of Vocational Expert, Tr. 260–61. He testified that Mr. Nelson's prior work as a carpenter was medium and skilled, while his work as a cashier was light and semi-skilled. Tr. 53–54.

---

[1] In his late 20s, Mr. Nelson received a diagnosis of paranoid schizophrenia. Tr. 386. He testified to a fear of swallowing his tongue, Tr. 48; *see also* 386, and social anxiety, Tr. 44–47. Mr. Nelson's counsel argued that he "had an excellent work history despite his mental health conditions" until 2013. Tr. 57.

The ALJ asked the vocational expert to consider a hypothetical person of Ms. Nelson's age, education level, and past relevant work, who could lift and carry twenty-five to thirty pounds, but would have problems with repetitive reaching and the lifting of items of more than five pounds on the left side, who also has problems with crowds, stress outside the home, long-term memory, concentration when he lacks interest, and might not be able to perform complex tasks for eight hours a day, five days a week. Tr. 53–54. The vocational expert testified that no jobs would exist for such a person. Tr. 54.

The ALJ then suggested lifting and carrying capabilities of fifty pounds occasionally and twenty-five pounds frequently with occasional left arm overhead reaching, and specified that the person would have an ability to do simple, routine, repetitive tasks on a sustained basis over an eight hour work day in a stable work environment with no close interpersonal interactions with supervisors or co-workers and no interactions with the public. Tr. 55. The vocational expert testified that such a person would be able to do machine tender work at a medium level, of which there were 600 jobs in Connecticut and 80,000 nationally. Tr. 56, as well as packaging jobs and some cleaning positions, *id*.

The ALJ asked the vocational expert to consider only light jobs for such a person. Tr. 56. The vocational expert testified that light jobs included unskilled packaging, machine operation, and cleaning positions. Tr. 56.

The ALJ then asked the vocational expert how long such a person would have to stay on task to remain employed, Tr. 57; the vocational expert estimated that the person would need to stay on task ninety percent of the day, *id*.

On January 6, 2017, the ALJ determined that Mr. Nelson was not disabled from May 15, 2013 until January 6, 2017. Notice of Decision – Unfavorable ("ALJ Decision"), Tr. at 15–29.

The ALJ determined that Mr. Nelson's last insured date was December 31, 2015. ALJ Decision, Tr. 18.

At Step One, the ALJ determined that Mr. Nelson had not engaged in substantial gainful activity since May 15, 2013. Tr. 20.

At Step Two, the ALJ determined that Mr. Nelson had two severe impairments: "status post left shoulder arthroscopic surgery in February 2016 and schizophrenia (20 CFR 404.1520(c) and 416.920(c))." Tr. 20.

At Step Three, the ALJ found that Mr. Nelson "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926)," Tr. 21, and that Mr. Nelson has the residual functional capacity to perform medium work with certain limitations, including only occasionally reaching in front, laterally, or overhead with the left arm. Tr. 22.

The ALJ found that Mr. Nelson had musculoskeletal impairments but not an "extreme" limitation of his fine and gross movements, Tr. 21, and that the medical evidence suggested that he could perform medium work with left-side accommodations. Tr. 23. The ALJ based these findings, in part, on Mr. Nelson's ability to carry out activities of daily living. *Id.*

The ALJ acknowledged that, before surgery, Mr. Nelson "showed pain with range of motion, limited strength, and a positive impingement sign in [his] left shoulder." Tr. 24. The ALJ considered the July 2015 MRI, which revealed "diffuse supraspinatus tendinopathy, mild infraspinatus tendinopathy, and a partial tear, possibly as great as 50%." Tr. 24.

The ALJ afforded some weight to Dr. Herbert Reiher's April 2015 conclusion that Mr. Nelson had "only limited range of motion in [his] left shoulder" and "could only occasionally lift

20 pounds throughout a workday," Tr. 24, because Dr. Reiher's lifting restriction "appears to be based on the claimant's own reported limitations. Dr. Reiher, however, did not specify the degree of manipulate limitation the claimant would have." Tr. 24–25. The ALJ then afforded full weight to the 2015 state agency physicians' assessments that Mr. Nelson could perform medium exertional work. Tr. 25, 27; Def. Mem. in Supp. of Mot. to Affirm ("Def. Mem."), ECF No. 22-1, at 6. The ALJ concluded that "even based upon the limitations suggested by Dr. Reiher the significant number of light representative positions enumerated by the impartial vocational expert could be performed." Tr. 25.

Following surgery, the ALJ determined that Mr. Nelson experienced "minimal pain" and "reported only mild pain with overhead reaching, but otherwise no pain in his left shoulder." *Id.*

The ALJ found that Mr. Nelson's mental impairments "cause mild restrictions in his activities of daily living; moderate difficulties in social functioning; moderate difficulties in maintaining concentration . . . and no episodes of decompensation." Tr. 22. The ALJ considered 2013 and 2014 therapy notes, which were "largely unremarkable with normal mental status examinations, and few, if any complaints." Tr. 25. He noted that 2015 and 2016 treatment notes showed some anxiety, nervousness, increased isolation, and difficulty with finances. Tr. 25.

The ALJ also considered the opinion of treating physician Dr. Rajesh C. Parekh. Tr. 26. Dr. Parekh gave Mr. Nelson a global assessment of functioning ("GAF") of 59, and indicated that he would not be able to concentrate for extended periods or travel to unfamiliar places for 10% of the workday. Tr. 26. The ALJ gave little weight to Dr. Parekh's opinion because "[i]t is unclear why Dr. Parekh indicated that many areas of functioning did not apply [and] the opinion that the claimant would have difficulty concentrating for more than 10% of the workday is not

supported by the evidence of record[.]" Tr. 27. The ALJ adopted Dr. Parekh's assessment "to the extent it is consistent with the state agency physician's assessment." Tr. 22.

The ALJ gave some weight to the opinion of Dr. Jennifer Seldon, who performed a mental status examination of Mr. Nelson in 2015. Tr. 385–87. Overall, Dr. Seldon determined that Mr. Nelson was "interpersonally appropriate" and that his schizophrenia was "successfully treated with psychotropic medication." Tr. 387. She noted that a structured setting would enable Mr. Nelson to perform jobs that require appropriate interaction with "the public, colleagues, and supervisors." *Id*. The ALJ gave only some weight to Dr. Selden's structured work setting recommendation because "Dr. Selden did not state that the claimant was unable to perform sustained full time competitive employment or that the claimant required unscheduled work breaks or frequent absences." Tr. 26.

The ALJ gave some weight to the opinions of state agency psychological consultants Brown and Leveille, who "opined that [Mr. Nelson] could understand and retain directive[s] and carry out simple and repetitive tasks for 2-hour periods in a normal workday without special supervision." Tr. 27. The ALJ found sufficient evidence in the record to impose greater "limitation against interaction with the public" than the state agency consultants. Tr. 27; *see also* Tr. 25 (The ALJ determined that Mr. Nelson "would be reasonably limited to unskilled work in a stable environment [and with] a limitation against working with the public[.]").

At Step Four, the ALJ adopted the vocational expert's testimony and determined that Mr. Nelson "is unable to perform any past relevant work (20 CFR 404.1565 and 416.965)." However, he determined that "considering [Mr. Nelson's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national

economy" that Mr. Nelson could perform. Tr. 28. The ALJ found significant numbers of jobs at both the medium and light exertional levels. Tr. 28–29.

At Step Five, the ALJ concluded that Mr. Nelson "has not been under a disability, as defined in the Social Security Act, from May 15, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g))." Tr. 29.

On January 6, 2017, Mr. Nelson requested agency review. Social Security Administration, Notice of Appeals Council Action, Tr. 1. On January 4, 2018, the Appeals Council denied Mr. Nelson's request for review. *Id.*

### B. Procedural Background

On March 2, 2018, Mr. Nelson filed this appeal. Compl.

On June 4, 2018, Defendant filed an Answer and the administrative record. Answer, ECF No. 17.

On August 31, 2018, Mr. Nelson moved to reverse the decision of the Acting Commissioner. Pl. Mem.

On October 15, 2018, the Commissioner moved to affirm her decision. Def. Mot. to Affirm.

## II. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court reviewing a disability determination "must determine whether the Commissioner's conclusions 'are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard.'" *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)); *see also Moreau v. Berryhill*, No. 17-cv-396 (JCH), 2018 WL 1316197, at *3 (D. Conn. Mar. 14, 2018) ("[T]he court may only set aside the ALJ's determination as to social security disability if the

decision 'is based upon legal error or is not supported by substantial evidence.'") (internal citation omitted) (quoting *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).

"Substantial evidence is 'more than a mere scintilla.'" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran*, 569 F.3d at 112 (quoting *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008)); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) ("Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'") (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is a "very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault*, 683 F.3d at 448 (*quoting Dickson v. Zurko*, 527 U.S. 150, 153 (1999)).

## III. DISCUSSION

The Social Security Administration has established a five-step evaluation process for determining whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4). As the agency explains:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled . . . ;
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled . . . ;
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled . . . ;

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled . . . ;
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled . . . .

20 C.F.R. § 404.1520(a)(4).

Here, there is no issue with respect to Step One and Step Two, but there are issues involving Step Three, Step Four, and Step Five. Thus, a more detailed discussion of these steps is required.

Step Three requires the ALJ to determine whether the claimant has a disability that "meets or equals a listed impairment in appendix 1[.]" 20 C.F.R. § 404.1520(d). "If [the claimant's impairment(s) does not meet or equal a listed impairment, [the ALJ] will . . . make a finding about [the claimant's] residual functional capacity based on all the relevant . . . evidence in [the] case record . . . . [The ALJ will then] use [the] residual functional capacity assessment at the fourth step of the sequential evaluation process to determine if [the claimant] can do [his or her] past relevant work . . . and at the fifth step of the sequential evaluation process . . . to determine if [the claimant] can adjust to other work[.]" 20 C.F.R. § 404.1520(e).

At Step Three, the ALJ also will determine if the claimant can do sedentary, light, medium, heavy, or very heavy work. 20 C.F.R. § 404.1567. Light work:

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b). By contrast, medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

At Step Four, the ALJ considers the claimant's residual functional capacity. Residual functional capacity is "what an individual can still do despite his or her limitations." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) ("Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.") (*quoting* Social Security Ruling 96– 8p, July 2, 1996)). An ALJ must consider both a claimant's severe impairments and non-severe impairments in determining the claimant's residual functional capacity. 20 C.F.R. § 416.945(a)(2); *De Leon v. Sec'y of Health & Human Servs.*, 734 F.2d 930, 937 (2d Cir. 1984).

At Step Five, the ALJ considers the claimant's residual functional capacity, age, education, and work experience to determine if the claimant can work or is disabled. 20 C.F.R. § 404.1520(a)(4).

Mr. Nelson argues that the ALJ erred at these three steps by: (1) determining that Mr. Nelson could perform medium exertional work; (2) not restricting Mr. Nelson to a structured work setting; and (3) improperly instructing the vocational expert and then relying on his flawed testimony.

The Court disagrees.

### A.     Medium Exertional Work Finding

On this first issue, Mr. Nelson argues that the ALJ erred in: (1) finding that Mr. Nelson could perform medium work, Pl. Mem. of Law at 4; and (2) failing to consider Mr. Nelson's pre-surgery shoulder limitations and restrictions from 2013 to 2016, *id*. at 5–7.

Defendant argues that the ALJ's finding that Mr. Nelson could perform medium work was supported by medical evidence and Mr. Nelson's statements to health care providers, Def. Mem. at 6–9, and that the ALJ based his Step Five finding on the availability of suitable light or medium work. *Id*. at 8. Defendant argues that the ALJ based his work exertion level findings on substantial evidence. *Id*. at 5, 10.

The Court agrees.

At Step Four, the ALJ determined that Mr. Nelson had the residual functional capacity to perform medium work with only occasional reaching in front, laterally, and overhead with the left arm. Tr. 22. At Step Five, the ALJ determined that Mr. Nelson could perform medium exertional jobs such as machine tender, packager, and cleaner, Tr. 28, or light exertional jobs such as packager, machine operator, and cleaner, Tr. 29. Even if the ALJ had considered only medium jobs, as his Step Three and Four analysis suggested, substantial evidence supports such a finding. *Halloran*, 362 F.3d at 31 ("Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").

Mr. Nelson's medical records reasonably suggest that he could perform medium work with a left-arm limitation or accommodation from 2013-2016. For five months in 2013, Mr. Nelson worked as a carpenter. Tr. 65. Approximately one year later, in summer or fall of 2014, Mr. Nelson sought treatment for unexplained shoulder pain. Tr. 578 (July 8, 2015 Crossroads

Orthopaedic Sub Specialists LLC Note: "The patient states that he has had approximately a 12-month history of left shoulder pain that began insidiously without any precipitating event or injury recalled.").

For more than a year after that, he pursued non-surgical interventions such as physical therapy and steroid injections. Tr. 454, 574–75. During that time, his injury allegedly prevented him from returning to work as a carpenter, Tr. 578, but he looked for work in other industries (October 6, 2015 Paul Clark, LCSW Note: Mr. Nelson "stated that he has been applying for work at Lowe's, Books a Million, Best Buy, BJ's, and Electric Boat. [He] state[s] that he has been offered [a] job at EB but he may need special [accommodations] that he is still waiting to hear back about.").

By the summer and fall of 2015, Mr. Nelson's pain had increased and his ability to reach overhead on the left side had diminished. Tr. 574–75. He was not, however, taking pain medication, Tr. 575, and reported no sleep disturbance from the shoulder injury. Tr. 574.

In early 2016, Mr. Nelson had surgery. Tr. 562. Both the medical record and Mr. Nelson's testimony suggest that the surgery was effective. Tr. 39–40. At the hearing, Mr. Nelson testified that he could carry twenty-five to thirty pounds. Tr. 39.

This evidence reasonably supports a finding that Mr. Nelson could perform medium work with a left-side accommodation throughout 2013-16. *See* 20 C.F.R. § 404.1567(b)–(c). But, even if Mr. Nelson was limited to light work during this time, *see* 20 C.F.R. § 404.1567(b) (Light work "involves lifting no more than 20 pounds at a time[.]"), the ALJ's ultimate finding of disability accounted for this possibility. *See* Tr. 29 (At Step Five, the ALJ determined that Mr. Nelson could perform light exertional jobs such as packager, machine operator, and cleaner.).

As a result, the Court finds no error in the ALJ's decision. *See Brault*, 683 F.3d at 448 (Substantial evidence review is a "very deferential standard of review—even more so than the 'clearly erroneous' standard.").

**B.     Work Setting Finding**

Mr. Nelson also argues that the ALJ erred in: (1) finding that Mr. Nelson could work in a "stable environment" rather than "structured setting," Pl. Mem. of Law at 7; and (2) failing to incorporate Dr. Selden's finding that Mr. Nelson could only deal with colleagues and supervisors in a structured setting. *Id*.

Defendant argues that the ALJ's finding that Mr. Nelson could work in a stable environment was consistent with examinations performed by Mr. Nelson's treating physician (Dr. Parekh), state agency psychologists (Drs. Brown and Leveille), and Dr. Seldon's examination findings. Def. Mem. at 9–10. Defendant argues that the ALJ based his work setting findings on substantial evidence. *Id*. at 5, 10.

The Court agrees.

When assessing a claimant's mental health conditions, an ALJ will consider how those conditions present in the claimant, how they respond to treatment, and whether the conditions impose more than moderate limitations on the claimant's work-related functioning. *See Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) ("The reports of Petitioner's treating psychiatrists and most of her consulting doctors during the review period indicate that she was depressive, without psychotic features other than occasional self-reported hallucination, and that her condition improved with medication. None of the clinicians who examined her indicated that she had anything more than moderate limitations in her work-related functioning, and most reported less severe limitations.").

14

The ALJ's mental health disability finding must be supported by substantial evidence. *Id.* ("Although there was some conflicting medical evidence, the ALJ's determination that Petitioner could perform her previous unskilled work was well supported."); *Scott v. Berryhill*, No. 3:17-cv-211(JAM), 2018 WL 1608807, at *3 (D. Conn. Mar. 31, 2018) ("The ALJ gave Dr. Naungayan's October 2013 and April 2014 opinions only 'some weight,' because plaintiff subsequently showed significant improvement after both these dates with treatment. To the extent that the April 2014 opinion touched upon plaintiff's stress tolerance and attendance estimates, the ALJ gave Dr. Naungayan's opinion 'little weight' because of lack of support in the doctor's treatment notes. The ALJ concluded that Dr. Naungayan's opinion of April 2015 should be given 'no weight,' because this opinion was not consistent with the doctor's treatment notes.") (internal citations omitted)).

Mr. Nelson's medical and non-disability records reasonably suggest that he could work in a stable environment. For many years, Mr. Nelson "had an excellent work history despite his mental health conditions." Tr. 57. He worked as a carpenter for nearly two decades. Tr. 61, 71. He briefly worked as a retail store cashier, Tr. 54, 386–87, 455, and was looking for a retail position during the period at issue. Tr. 578. Mr. Nelson does not argue that he previously worked in structured environments or that he mentally decompensated during his period of unemployment. Additionally, substantial evidence supports a finding that Mr. Nelson requires a stable, not structured, work environment.

Though Mr. Nelson has schizophrenia and anxiety issues, his medical record generally suggests that his symptoms are mild to moderate and manageable. *See* Tr. 362 (Martin J. Maloney, DO, Oct. 29, 2014 Note: "Seen today for medication and therapy . . . . Medication compliant. Denied medication side effects. Alert, oriented. Thoughts are goal directed. Affect is

unrestricted. Mood is euthymic [i.e., normal].”); Tr. 405 (Rajesh C. Parekh, M.D., Oct. 2, 2015

Progress Note: “Reports doing well . . . . The patient comes in today for follow up of

Schizophrenia . . . . He . . . takes the medication every day regardless of school or work status.

He is not having any significant side effects from the medication. The medication seems to last

the entire day . . . . He is currently receiving therapy from Paul C.”); Tr. 382–84 (Herbert Reiher,

M.D., April 10, 2015 Disability Evaluation: “He has schizophrenia diagnosed in 1995 and sees

psychiatry . . . . Based on today’s evaluation, the patient could be expected to sit for 8 hours in an

8-hour workday . . . . He has no workplace environmental limitations.”); Tr. 79–80 (Christopher

Leveille Psy.D., Nov. 27, 2015, Findings of Fact and Analysis of Evidence: “continues trmt . . . .

takes medications daily, seems to last entire day, he is not having any significant side effects,

looking for work, there are no concerns . . . communication is normal and concentration [is]

normal[.]”); Tr. 604 (Rajesh C. Parekh, M.D., Jan. 26, 2016 Progress Note: “Psychiatric . . .

judgment and insight intact, judgment for everyday activities and social situations within normal

limits, insight intact . . . rate of thoughts normal, thought content logical . . . mood normal, affect

appropriate . . . associations within normal limits . . . no hallucinations, no delusions present, no

psychotic thoughts.”).

   Mr. Nelson contends that the lengthy record of his mental capabilities is undermined by

Dr. Selden’s recommendation that he work only in a structured setting. Pl. Mem. of Law at 7. Dr.

Selden, however, generally found that Mr. Nelson’s schizophrenia was “successfully treated with

psychotropic medication,” Tr. 387, and recommended a structured setting for jobs that included

interaction with the public:

> On mental status exam, Mr. Nelson was interpersonally appropriate. He did well
> superficially on a cognitive screening but had mild working memory and short-term
> memory lapses and reductions in abstract thinking. His ability to tolerate routine

stresses would be adequate, and in a structured setting, he would be able to interact appropriately with the public, colleagues, and supervisors.

*Id.* In any event, the ALJ excluded jobs requiring interaction with the public. Tr. 26–27.[2]

The ALJ based his work setting findings on Dr. Parekh's treatment notes, Dr. Selden's overall evaluation of Mr. Nelson's functioning (e.g., "GAF score of 72, indicating no more than slight impairments"), *id.*, Tr. 387, and the findings of two state agency psychologists who did not recommend a structured work setting. Tr. 26–27. The ALJ's determination that Mr. Nelson required no more than a stable work environment and limited interaction with the public was based on substantial medical evidence that Mr. Nelson's schizophrenia and anxiety were relatively mild, well-treated conditions. *See Zabala*, 595 F.3d at 410 ("None of the clinicians who examined her indicated that she had anything more than moderate limitations in her work-related functioning, and most reported less severe limitations.").

As a result, the Court finds no error in the ALJ's work setting finding. *See Moran*, 569 F.3d at 112 (Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").

### C.     The ALJ's Instructions to the Vocational Expert

Finally, Mr. Nelson argues that the ALJ improperly instructed the vocational expert by failing to advise him of Mr. Nelson's pre-surgery shoulder limitations, Dr. Reiher's 2015 finding that Mr. Nelson could only perform light work, and Dr. Selden's finding that Mr. Nelson could only work in a structured setting. Pl. Mem. of Law at 9.

Defendant argues that the ALJ "made a complete and thorough RFC finding, upon which his hypothetical question[s] to the vocational expert [were] based." Def. Mem. at 10.

_____

[2] The ALJ found "sufficient evidence on record to support a limitation against interaction with the public." Tr. 27. Mr. Nelson had testified to having anxiety when leaving the house. Tr. 44.

The Court agrees.

"An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as 'there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion[.]'" *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (*quoting Dumas v. Schweiker,* 712 F.2d 1545, 1553–54 (2d Cir.1983)); *see Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 114 (2d Cir. 2010) ("Because we find no error in the ALJ's RFC assessment, we likewise conclude that the ALJ did not err in posing a hypothetical question to the vocational expert that was based on that assessment.")

As discussed above, Mr. Nelson's pre-surgery medical evidence could have reasonably supported a finding that he was capable of medium exertional work with a left-arm limitation. *See* Tr. 575 (taking no pain medication for the injury); Tr. 574 (no sleep disturbance from the injury); Tr. 454, 574–75 (injury responded temporarily to various treatments). Further, Dr. Reiher was unclear about the specific limitations in manipulation or lifting that led to his recommendation of light work. *See* Tr. 384 ("He has manipulative limitations of shoulder pain and decreased range of motion with repetitive reaching."). But two agency physicians found that Mr. Nelson could perform medium work. Tr. 25, 27. Despite this substantial evidence, the ALJ also instructed the vocational expert to consider appropriate light work. Tr. 56.

Similarly, the record as a whole—and even Dr. Selden's full report—did not suggest that Mr. Nelson could only work in a structured setting. *See, e.g.*, Tr. 387 (Dr. Selden's finding that Mr. Nelson had a "GAF score of 72, indicating no more than slight impairments" and that a structured setting would enable him to work with the public), Tr. 26–27 (the findings of state agency psychologists that Mr. Nelson's schizophrenia imposed few limitations), Tr. 26–27.

Accordingly, the ALJ's residual functional capacity was supported by substantial evidence, was used as the basis for his hypotheticals to the vocational expert, and the ALJ committed no error by relying on the vocational expert's testimony. *McIntyre*, 758 F.3d at 151; *Salmini*, 371 F. App'x at 114 ("Because we find no error in the ALJ's RFC assessment, we likewise conclude that the ALJ did not err in posing a hypothetical question to the vocational expert that was based on that assessment.")

## IV.     CONCLUSION

For the reasons set forth above, the Court **DENIES** Mr. Nelson's motion to reverse the decision of the Acting Commissioner, Pl. Mot. to Reverse, ECF No. 20; and **GRANTS** the Acting Commissioner's motion to affirm her decision. Def. Mot. to Affirm.

The Clerk of the Court is respectfully directed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 17th day of May, 2019.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE